

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00381-CV

IN THE INTEREST OF C.M., G.M.,
J.W, AND F.W., CHILDREN

----------

FROM COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY
TRIAL COURT NOS. 12687-JR-F, 12687-JR-F-2

----------

## MEMORANDUM OPINION[1]

----------

Appellant Sue White[2] appeals from the trial court's final order terminating

her parental rights to her children Gail Moore, Calvin Moore, James White, and

Faye White. In two issues, Sue argues that the evidence was legally and

---

[1]*See* Tex. R. App. P. 47.4.

[2]We refer to the minors and their family members by fictitious names to protect the minors' identities. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2017); Tex. R. App. P. 9.8(b).

factually insufficient to support the trial court's finding that termination of her parental rights was in her children's best interests. We disagree and affirm the trial court's final order of termination. *See* Tex. R. App. P. 43.2(a).

## I. BACKGROUND

Sue married Greg Moore in 2009 when she was seventeen and quickly had two children: Gail in September 2010 and Calvin in July 2012. The marriage soon fell apart, and Greg and Sue divorced in the fall of 2012 shortly after Calvin's birth. Sue averred that Greg was physically abusive; but this issue was not raised in their divorce, and Greg denied Sue's claims. In any event, Greg, who was twenty-one at the time of the divorce, believed the children would be better off without him and did not request custody or visitation. Greg sporadically paid child support when he was employed and did not see the children for approximately four years because Sue told him she had a protective order against him. Further, Sue took steps to hide where she lived so Greg could not find her or their children.

Sue met Tom White in March 2013 through a dating web site. Tom had custody of his two children from his prior relationship with Christy Atkins: Cole White, who was nine, and Andy White, who was four. Sue and Tom married in September 2013, and their son James White was born in February 2014. When Sue was pregnant with her fourth child in March 2016, Cole and Andy began to disclose what was later described as "a horrific pattern of . . . psychological torture and emotional and physical abuse" by Sue against them. For example,

Cole and Andy asserted that Sue withheld food from them and forced them to drink cayenne pepper mixed in apple cider vinegar to make them vomit the food she believed they stole.[3] They also accused Sue of punishing them by locking them in a closet for extended periods with a bucket to use as a bathroom, making them lick the toilet, placing a lighter under their tongues, and hitting them with a boat paddle, a belt, and metal spoons. Eventually Sue was indicted with twenty-seven counts of felony injury to Cole, Andy, and Gail.[4] *See* Tex. Penal Code Ann. § 22.04(a), (e)–(f) (West Supp. 2017).

After the abuse came to light in March 2016, the Department of Family and Protective Services (DFPS) filed a petition to terminate Christy's and Tom's parental rights to Cole and Andy, Sue's and Greg's parental rights to Gail and Calvin, and Sue's and Tom's parental rights to James. The trial court granted DFPS's emergency motion to remove the children from Sue and Tom's custody and named DFPS as their temporary managing conservator. Cole and Andy were placed with Tom's parents, while Gail, Calvin, and James were placed with Sue's maternal aunt and uncle, Mary and Don Hampton. Sue gave birth to Faye

---

[3]When twelve-year-old Cole was removed from Sue and Tom, he weighed 61 pounds. Eighteen months later, Cole weighed 100 pounds.

[4]The one count involving Gail alleged that she was mentally injured by Sue's actions against Cole and Andy while Gail was in the home. Tom was also indicted for failing to protect Cole, Andy, and Gail from Sue and for denying under oath that he told Cole to lie at an adversary hearing about how Cole was injured—"playing rough" and not by Sue's abuse. *See* Tex. Penal Code Ann. § 22.041(c) (West 2011), § 37.03 (West 2016).

White while she was incarcerated in July 2016; the trial court immediately named DFPS her temporary managing conservator, and DFPS placed Faye with the Hamptons. Christy voluntarily relinquished her parental rights to Cole and Andy; Tom voluntarily relinquished his parental rights to Cole, Andy, James, and Faye.[5] *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(K), 161.103 (West Supp. 2017).

After her June 2016 arrest, Sue was incarcerated until she posted a bond in 2017 for the $405,000 bail amount. Based on the nature of the criminal allegations against them, Sue and Tom could not communicate with the children while on pretrial release. *See* Tex. Code Crim. Proc. Ann. art. 17.41 (West 2015). On September 5, 2017, after a seven-day trial, a jury found Sue guilty of three counts of first-degree injury to a child and of thirteen counts of third-degree injury to a child.[6] The trial court sentenced her, based on the jury's punishment verdict, to concurrent sentences of forty-five years' confinement for each of the first-degree felonies and ten years' confinement for each of the third-degree felonies. Sue filed a motion for new trial asserting only that "the verdict is contrary to the law and the evidence," which was deemed denied. *See* Tex. R. App. P. 21.3(h), 21.8(c). Sue has appealed the convictions, and her appeal is currently pending in this court.

---

[5]Both were given limited, post-termination contact with their children. *See* Tex. Fam. Code Ann. § 161.2061 (West Supp. 2017).

[6]The jury acquitted her of ten counts, and the State abandoned one count.

4

When Sue's criminal trial concluded, the trial court heard DFPS's termination petition. After a three-day bench trial, the trial court terminated Christy's and Tom's parental rights to Cole and Andy and appointed DFPS as their permanent managing conservator.[7] Based on Greg's conduct during the pendency of the termination action, DFPS abandoned its requests to terminate his parental rights to Gail and Calvin and to be named their managing conservator. The parties agreed that the trial court, therefore, had two options regarding Gail and Calvin: appoint Sue managing conservator or appoint Greg. The trial court appointed Greg permanent managing conservator of Gail and Calvin and terminated Sue's parental rights. Finally, the trial court terminated Sue's and Tom's parental rights to James and Faye and appointed DFPS as their permanent managing conservator.[8] In summary and as relevant to this appeal, the trial court concluded that DFPS had shown by clear and convincing evidence that Sue had engaged in conduct satisfying multiple statutory termination grounds[9] and that the termination of her parental rights to Gail, Calvin, James, and Faye was in their best interests. *See* Tex. Fam. Code Ann. § 161.001(b), § 161.206(a) (West Supp. 2017). Sue now argues on appeal that the evidence

---

[7]DFPS's stated plan was for Tom's parents to adopt Cole and Andy.

[8]DFPS's and the Hamptons' stated plan was for the Hamptons to adopt James and Faye.

[9]Specifically, the trial court found that Sue's conduct satisfied section 161.001(b)(1)(D), (E), (L), and (O) regarding Gail, Calvin, and James and section 161.001(b)(1)(E), (L), and (O) regarding Faye.

5

heard by the trial court was legally and factually insufficient to support the best-interest finding required by section 161.001(b)(2).  Sue does not argue that the evidence insufficiently supported a finding that her actions met a statutory conduct ground listed in section 161.001(b)(1).  No party challenges the trial court's termination of Christy's and Tom's parental rights to Cole and Andy, and Tom does not appeal from the termination of his parental rights to James and Faye.

## II. STANDARD AND SCOPE OF REVIEW

Although the parent-child relationship is to be protected, it may be terminated upon a showing by clear and convincing evidence that the parent's actions satisfy a statutory ground justifying termination and that termination would be in the child's best interest.  *See* Tex. Fam. Code Ann. §§ 161.001(b), 161.206; *See In re E.R.*, 385 S.W.3d 552, 554–55 (Tex. 2012).  Evidence is clear and convincing if it "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007 (West 2014).

If the legal sufficiency of the evidence is challenged, we review all the evidence in the light most favorable to the finding, resolving any disputed facts in favor of the finding if a reasonable fact-finder could have done so and disregarding all evidence that a reasonable fact-finder could disregard.  *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).  We may not re-weigh or re-determine credibility issues, again deferring to the fact-finder's determinations if reasonable.

6

*See id.* at 573–74. A factual-sufficiency issue also requires a review of the entire record, giving due deference to the fact-finder's findings. *See In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Evidence is factually sufficient if a fact-finder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the child's best interest. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

### III. BEST INTEREST

A child's best interest is a trial court's "primary consideration" when determining conservatorship, possession, or access to the child. Tex. Fam. Code Ann. § 153.002 (West 2014); *see also id.* § 161.205 (West 2014) (stating if termination not ordered, trial court may either deny the petition or "render any order in the best interest of the child"). There is a strong presumption that keeping a child with a parent is in the child's best interest. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). But the emotional and physical interests of the child may not be sacrificed merely to preserve the parent-child relationship. *See In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013). There are several nonexclusive factors a trial court may consider in determining a child's best interest, including the emotional and physical needs of the child now and in the future, the parenting abilities of the individuals seeking custody, the plans for the child, the stability of the home or proposed placement, the acts or omissions of the parent indicating that the parent-child relationship is not a proper one, and

7

the desires of the child. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also C.H.*, 89 S.W.3d at 27.

Sue's arguments attacking the sufficiency of the evidence to support the trial court's findings that termination of her parental rights was in Gail's, Calvin's, James's, and Faye's best interests mainly focus on (1) the disruption and stress to Gail and Calvin by moving them to South Dakota where Greg lives and away from the Hamptons, James, and Faye; (2) Greg's past abusive behavior during their marriage and the tenuous nature of his current "super-dad" status; and (3) the finality of the termination of her parental rights, the Hamptons' adoption, and Greg's sole managing conservatorship, none of which can be remedied when she is released after a presumed successful appeal of her criminal convictions.

Greg testified at the trial and admitted that he had a prior criminal record and that he did not seek custody or visitation with Gail and Calvin when he divorced Sue because he did not want them "to go between two different houses" as he had growing up. At that time he was twenty-one and did not have regular employment, which made it difficult to consistently pay child support. He denied Sue's abuse allegations against him. Greg testified that he lives with his girlfriend in South Dakota and has steady employment with regular work hours. As such, his child-support payments come directly out of his paycheck. He believes that he is a better parent now than when he was married to Sue and that he could give Gail and Calvin a loving home. Greg stated that he wanted to be

8

named Gail and Calvin's permanent managing conservator and that he had made arrangements for their after-school care, had located a counselor for Gail and Calvin who specialized in post-traumatic stress disorder,[10] and had prepared bedrooms for them in his home.

Although he had not seen Gail and Calvin since his 2012 divorce from Sue,[11] he began regularly visiting them beginning in 2016, driving from South Dakota to Wichita Falls each time. Gail and Calvin initially were "distant" when Greg visited, but they soon became excited to see him and began asking when they could go to South Dakota with him. Although Mary Hampton testified that she would prefer to keep all four of Sue's children, she believed that Greg was ready to parent Gail and Calvin. Gail and Calvin had told Mary that they were ready to go home with Greg. Mary also noted that Sue told Gail and Calvin to call Greg "bad dad" and had tried to "control every aspect" of the children's lives while incarcerated through frequent and intrusive phone calls.[12]

---

[10]Both Gail and Calvin had been diagnosed with the disorder as a result of being exposed to Sue's abuse of Cole and Andy.

[11]Greg received a protective order in the mail shortly after the divorce, leading him to believe he could not see Gail and Calvin. There was some indication that Sue had forged the protective order and sent it to Greg, but Sue denied doing so. The guardian ad litem for the children, Amanda Mataska, testified that Sue stated she had a protective order against Greg.

[12]In one phone call, Sue asked Mary while on speaker phone and within the children's hearing what Mary was "feeding them to make them fat." Once DFPS discovered Sue was making such calls, her telephone visitation was withdrawn.

The DFPS caseworker for the children, Patricia Pierce, testified that Greg alleviated each of her concerns about his parenting abilities and fully complied with his service plan. Amanda Mataska, the guardian ad litem, similarly testified that Greg "does very well" with Gail and Calvin and that they "enjoy being around him." Greg's actions "impressed" Mataska, and she stated that she had never seen an out-of-state, noncustodial father do as much to regain custody of his children as Greg had. Both Pierce and Mataska knew about Greg's criminal record but recommended that he be named Gail and Calvin's permanent managing conservator and that Sue's parental rights be terminated based on Gail's and Calvin's best interests. Greg and Pierce recognized that moving Gail and Calvin to South Dakota would be disruptive because it would separate them from the Hamptons, James, and Faye, but agreed that Greg could provide the home Gail and Calvin need.

Regarding James and Faye, Mary testified that she and Don planned to adopt them. Indeed, the Hamptons are the only parents James and Faye have known. The Hamptons are trained as counselors. Greg stated that he would ensure Gail and Calvin continued to have contact with James and Faye. Pierce stated that allowing Sue to continue to have conservatorship of James or Faye would not be in their best interests because it would significantly impair their physical and emotional well-being. Mataska agreed that the termination of Sue's parental rights and adoption by the Hamptons would be in the best interests of

James and Faye. In making this recommendation, Mataska recognized that Sue maintained her innocence.

Sue testified that Greg was physically and emotionally abusive to her and to Gail during the marriage. Although the abuse was not noted in Sue's April 2016 mental-health evaluation, which occurred shortly before her criminal trial, Sue insisted that she reported it to the psychologist during the evaluation. She was surprised that Greg's home study had been positive but did not believe Greg should be named Gail and Calvin's managing conservator based on his past behavior. Sue also did not want her parental rights to James and Faye to be terminated because if the Hamptons adopted, it could not be "undone" when her convictions are reversed on appeal.[13] Sue denied the abuse allegations that led to her convictions, asserting that Tom was the primary actor, that Andy's injuries were caused by Cole, that Cole and Andy were "hyper" when they played, and that Cole had a "biting habit." She asserted that she had "high hopes" her appeal would be successful:

> There was a lot of evidence that did not get put in, even though I requested it. There were allegations against me that we could have proven wrong. The children, in fact, countered their own accusations many times. They would give one version, and then when my attorney asked them the same thing, they would give a second version, but still said that they were both correct. . . . [T]here was inappropriate jury conduct that was not addressed.

---

[13]Sue did concede that if her convictions were not reversed on appeal, "there would be no point in fighting" and she would voluntarily relinquish her parental rights to the four children.

11

In short, she claimed that Cole and Andy told "outlandish lies." For her, this explained why her children should continue to have a relationship with her:

> Well, for one, I'm their mother. And for, two, I know my innocence, and I have high hopes for an appeal. And for my children to be robbed of their mother and me to be robbed of my children for something that I did not do, it's not fair to either one of us. It can be easily overturned. You adopt out my children, how am I to unadopt them? If they're taken to South Dakota and already said not to be even allowed for me to . . . ever have contact, how is that justified if I'm found innocent of that?

Sue asked that her four children be kept together with the Hamptons and that her rights not be terminated because it would be in the children's best interests "for them to stay together." As DFPS states in its appellate brief, Sue's "plan is for the children to remain in limbo while she appeals her convictions."

We conclude that the record reflects legally and factually sufficient evidence to support one or more of the *Holley* factors and, therefore, to support the trial court's best-interest findings. Sue's criminal conduct, for which she was convicted and given lengthy sentences of confinement by a jury and which involved the systematic torture of her stepsons in Gail and Calvin's presence, is certainly relevant to a best-interest finding. *See Trevino v. Tex. Dep't of Protective and Regulatory Servs.*, 893 S.W.2d 243, 248 (Tex. App.—Austin 1995, no writ). The children's stability and permanence were at the forefront of the trial court's conclusions. *See generally In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) ("Stability and permanence are paramount in the upbringing of a child."). Indeed, the evidence showed that Sue could not

12

provide the children with a safe and stable environment and that Greg and the Hamptons could. The only parents James and Faye have known are the Hamptons, who are both counselors and have ably provided for their care. Gail and Calvin have expressed that they want to live with Greg, and Greg plans to ensure that they continue to have contact with James and Faye because he recognized such contact is important for all four children. Both Pierce and Mataska were impressed with Greg's efforts to parent Gail and Calvin and the steps he took to prepare for parenting. Pierce testified there was no reason Greg could not be named Gail and Calvin's permanent managing conservator. Mataska stated that Gail and Calvin should be able to live with Greg. Mary Hampton believed Gail and Calvin would be safe with Greg.

Pierce also testified that none of the children's best interests would be served by continuing to have contact with Sue. Mataska agreed that termination of Sue's parental rights would be in the children's best interests. Finally, the children's attorney ad litem agreed that the children's best interests would be served by the termination of Sue's parental rights. Indeed, even if Sue's criminal appeal eventually is successful, she would be able to "come back" years later and "disrupt [the children's] home" if the trial court did not terminate her parental rights. *See generally Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ) (recognizing best-interest analysis focuses on child's best interest, not parent's).

13

Although Sue testified that she should continue to have contact with her children at least until her convictions are final, the remainder of the evidence showed that the immediate termination of her parental rights was in each child's best interest. We are not empowered in our review of the sufficiency of the evidence, whether factual or legal, to re-weigh the evidence and credit Sue's testimony to the exclusion of the remainder of the evidence. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *J.P.B.*, 180 S.W.3d 573–74. In closing arguments, Greg's counsel ably summed up why the clear and convincing evidence showed that termination of Sue's parental rights would be in the best interests of Gail and Calvin, which is also applicable to James and Faye:

> And what it sounds like is that what [Sue] wants is to go to the chalkboard and erase everything that she's done and give her a chance again and just forget about the whole thing.
>
> . . . It's not in the children's best interest for [Sue] to keep her rights . . . . [The children] deserve a mother and they deserve a father. And that's not going to happen if [Sue] maintains her rights. . . .

## IV. CONCLUSION

After considering the *Holley* factors under our standard and scope of review, we conclude that the clear and convincing evidence before the fact-finder was legally and factually sufficient to support the conclusion that the termination of Sue's parental rights was in the best interests of Gail, Calvin, James, and Faye. *See, e.g., In re J.I.M.*, 517 S.W.3d 277, 285–87 (Tex. App.—San Antonio

14

2017, pet. denied); *In re A.K.*, 487 S.W.3d 679, 696–97 (Tex. App.—San Antonio 2016, no pet.); *In re R.A.L.*, 291 S.W.3d 438, 444–45 (Tex. App.—Texarkana 2009, no pet.).  Accordingly, we overrule Sue's issues and affirm the trial court's final order of termination.

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  GABRIEL, KERR, and PITTMAN, JJ.

DELIVERED:  May 9, 2018