**IN the INTEREST OF J.I.M. and A.A.M.**

**No. 04-16-00766-CV**

Court of Appeals of Texas, San Antonio.

Delivered and Filed: March 22, 2017

Review Denied June 16, 2017

· Alana Pearsall, Pearsall Law Firm, PLLC, 11107 Wurzbach Road, Suite 602, San Antonio, TX 78269, for Appellant.

Andrew Warthen, Paul Elizondo Tower, 101 W. Nueva St., San Antonio, TX 78205, Sally L. Justice, Law Office of Sally Justice, 257 E. Edgewood Place, San Antonio, TX 78209, for Appellee.

Sitting: Karen Angelini, Justice, Rebeca C. Martinez, Justice, Luz Elena D. Chapa, Justice

## MEMORANDUM OPINION

Opinion by: Karen Angelini, Justice

Dessarae M. appeals from the trial court's order terminating her parental rights to her children J.I.M. and A.A.M. She brings one issue on appeal, arguing that the trial court's best-interest finding is not supported by legally and factually sufficient evidence. We affirm.

## BACKGROUND

On July 5, 2016, the Department of Family and Protective Services ("the Department") filed an Original Petition for Protection of a Child for Conservatorship, and for Termination in a Suit Affecting the Parent-Child Relationship. On November 8, 2016, the case was tried to the bench. At trial, Officer Becerra of the San Antonio Police Department testified that he responded to the original 911 call. According to Officer Becerra, the 911 caller reported that "there was a reckless driver" who was "striking her child while operating a motor vehicle." The caller "felt that the children were in danger" and had "observed the children crying." Officer Becerra testified that when he pulled into the drive-in restaurant, he saw Dessarae M. and two children in the car. According to Officer Becerra, one of the children, two-year-old J.I.M.,[1] "had apparent injury to his face, redness and whatnot." There was "a small cut" underneath his left eye. The other child, A.A.M., was a baby and less than a year old. Officer Becerra testified that "[b]oth of the children were crying." Officer Becerra testified that he investigated and interviewed a witness at the scene, the same person who had called 911. The witness told Officer Becerra that she had seen Dessarae M. operating the vehicle, "striking her child repeatedly," and "driving recklessly." Officer Becerra testified that the witness described Dessarae M. as "swerving in and out of lanes" and braking erratically. The witness told Officer Becerra that the child "struck the dashboard of the vehicle." The witness followed Dessarae M. as she stopped briefly at one restaurant and continued following Dessarae M.

---

1. J.I.M. was born on August 4, 2013. Thus, at the time of this incident, he was almost three years-old. At the time of trial, J.I.M. was three years-old.

as she traveled east. Dessarae M. then stopped at the drive-in restaurant where Officer Becerra located her and the witness. When Officer Becerra questioned Dessarae M., she denied that she had struck her child. Officer Becerra placed Dessarae M. under arrest and took an inventory of the car. There was not a car seat for the child who had struck the dashboard.

Alicia Craft, the Department's caseworker, testified that she requested aggravated circumstances to be pursued against Dessarae M. in this case. Craft was present at the hearing on the issue. According to Craft, the court granted aggravated circumstances against Dessarae M. and also waived the requirement for reasonable efforts to be made to reunify the children with their mother. The State then introduced, without objection, three exhibits. State's Exhibit 1 was a final order of termination in Cause Number 2010-PA-02003 terminating the parental rights of Dessarae M. to one child. State's Exhibit 2 was a final order of termination in Cause Number 2007-PA-02202 terminating the parental rights of Dessarae M. to two other children. State's Exhibit 3 was an order of termination in Cause Number 2010-PA-02003 terminating Dessarae M.'s parental rights to another child. Thus, Dessarae M. previously had her parental rights terminated with respect to four other children.

Craft testified that in each of these previous cases, Dessarae M. had her parental rights terminated on endangerment grounds. With respect to the first case, Craft testified that Dessarae M.'s rights had been terminated based on "drug abuse and physical neglect." In one case, Dessarae M. had shaken and slapped her child with her hand on his back, face, and buttocks, which left red marks all over his body. In another case, Dessarae M. would leave her children with people for days at

a time and not return. Craft emphasized that in the present case, there were also allegations of physical abuse of a child. Craft testified that when she became the caseworker, she "learned that on the day of the removal, the mother was driving with the children, and she was arrested due to the physical endangerment of her children." According to Craft, J.I.M. underwent a forensic interview, and the results of that interview showed that "while [J.I.M.] had facial scratches and bleeding on his face, there was no subdermal or fractures underneath the skin." Craft testified that when she met with Dessarae M., Dessarae M. denied having struck J.I.M.

Craft testified that Dessarae M. is currently "being held for child endangerment with bodily intent." Craft testified that when she spoke with two-year-old J.I.M., he said "that he was with mean people, that his mother has been mean to him, [and] that he likes it where he is now." Craft recognized that J.I.M. has a limited ability to express his desires and has not been able to say more. According to Craft, J.I.M. is "currently placed with a maternal relative" and is bonded with that relative. Adoption is the future goal. Craft testified that J.I.M. "is very happy" and "settled in." J.I.M. "is able to communicate well with the relatives." Craft testified,

> He loves to show me his room. He calls it his house, his dogs. He talks about [he] and his sister living in the home for quite some time, as much time as a three-year-old can, you know express. He calls the relatives "Mom" and "Dad." He is very happy.

Craft testified that the children's current and future needs will be met at their current placement.

Craft testified that because Dessarae M. has been incarcerated since she was arrested, Craft had not had an opportunity to see Dessarae M. with J.I.M. and A.A.M.

According to Craft, Dessarae M. cannot meet the needs of her children. When asked if Dessarae M. has ever expressed a desire to change her behaviors, Craft testified that Dessarae M. "has expressed that she doesn't have any behaviors to change." According to Craft, Dessarae M. holds this belief even though she has already had her rights to four other children terminated in previous cases. In Craft's opinion, it was in J.I.M. and A.A.M.'s best interest to have Dessarae M.'s parental rights terminated because Dessarae M. "has exhibited a pattern of behavior over a long period of time that has shown that she neither cares nor is able to meet the needs of her children."

Dessarae M. testified that on the day in question, she pulled into the drive-in restaurant to buckle J.I.M. into his car seat: "He was in the shoulder strap car seat. I also had a booster seat too in there for him." Dessarae M. testified J.I.M. "was in the far right back seat," and A.A.M. "was in her carrier." Dessarae M. argued that because she is four feet, nine inches tall, she is physically incapable of reaching J.I.M. in the back seat to hit him. According to Dessarae M., she was buckling J.I.M. into the car seat when she "saw all these cop cars coming with the ambulance." The officer told her that he had received a call reporting she "was brutally attacking [her] son." Dessarae M. told the officer that she "had proof on [her] phone that [her] son fell the day before at [her] friend Amanda's house." Dessarae M. testified, "That could be the mean people he is saying." Dessarae M. testified that she told the officer she had not hit J.I.M. but he said "he didn't want to effing [sic] hear it."

Dessarae M. testified she has been able to work services while in jail. She is enrolled in a parenting class, has engaged in individual and group counseling, and is enrolled in Recovery in Motion. She testified she was also "taking [her] GED again." She stated that she is currently being held on the charge of bodily injury to a child and that bond is set at $75,000.

On cross-examination, Dessarae M. was questioned about the three previous cases that resulted in the termination of her parental rights to four other children. When asked whether she recalled the types of behaviors she engaged in that led to the termination of her parental rights, Dessarae M. replied, "I remember I was taking extensive drug tests because the dad was on drugs, and I passed all my drug tests. But, I mean, I guess because the guy kept coming around...." With respect to the first case in 2005, Dessarae M. was asked whether she disputed "the finding that you physically abused [your son] by shaking him and slapping him with your hands that left red marks." Dessarae M. replied, "I do disagree with that." The State asked, "Never happened?" Dessarae M. clarified, "Not from my hand." Dessarae M. was asked whether she believed the trial court ruled incorrectly in the three previous cases. Dessarae M. testified, "The court has it wrong? That is in the CPS reports that the dad kept coming around, and I was being irresponsible." The State clarified its question: "Do you think the court got it wrong that you did endanger your children in three separate instances prior to this case." Dessarae M. replied, "Yes, they got it wrong, especially this time." When asked to explain why she believed the previous courts had ruled incorrectly, Dessarae M. replied,

Okay. With [E.], I was in jail. and somebody made a report, and they used that against me. I was already in jail, and they said I physically abused them after three months in jail. This time, my son, I thought I found a correct babysitter. She is a family friend, Amanda. I go to

work and come home, and [J.I.M.] is like scratched up in the face.

Dessarae M. was asked what she would have done differently in parenting her four previous children to whom she had lost parental rights. Dessarae M. replied,

> I already have. I would make sure me [sic] and my kids had a stable home. I had a car this time. I made sure that I stayed in parenting classes. Of course, I'm not able to bring proof because I have been in jail since the day that this happened, but I have a lot of proof of me having a stable home, stable jobs.

Dessarae M. was then asked about "the physical abuse" sustained by her previous four kids. When asked again about physically abusing her son by shaking him and slapping him, Dessarae M. testified,

> That is not true, but it was used against me because my mother did that, my mother, Teresa. And that day, my grandma punched me in my stomach while I was pregnant. I don't like to talk about that.

The State clarified, "But if we could sum up, it is other people [who] abused your children and not you?" Dessarae M. replied, "I mean, I could say that I left them with people and they got hurt, yeah, and I have no control because it was like when I went to work. But that day—I can't talk about that day." Dessarae M. claimed that in the instant case, her "son was out of the car seat because he unbuckled himself and stood up, so [she] pulled over and did the right thing to buckle him in."

Finally, J.I.M. and A.A.M.'s aunt, Sarah M., testified. Sarah M. testified that she has two bachelor's degrees, one in criminal justice and the other in psychology. She also has a master's degree "in marriage and family therapy, human services." At the time of trial, Sarah M. and her husband had been J.I.M. and A.A.M.'s caregivers for two months. Sarah M. testified that J.I.M. and A.A.M. were "flourishing," were "growing," and were "beyond happy." Sarah M. testified that J.I.M.'s injuries to his lip and face had healed. When asked whether he had any after-effects from his injuries, Sarah M. testified,

> He engages in self-injurious behaviors as far as banging his head on the wall, hitting his face. He punches his stomach. He punches his face. He is redirected multiple times when he does engage in these behaviors. He attempts to hit his sister with shoes on the floor, and he is redirected as well that we don't do that behavior in our house.

Sarah M. was then asked if J.I.M.'s behavior was improving, Sarah M. responded,

> Yes, [it is]. He does—he is able to be redirected. He knows when—"Okay. You get two minutes of timeout," and he comes back and rejoins. He is learning his alphabet, his numbers. He's learning his colors. He is starting full sentences. We are working on speech therapy. He is learning how—the Ds and the Rs and the differences between those two.

Sarah M. was asked whether the children were developmentally delayed when they came into her care. She replied,

> Yes, and according to the doctors as well, they were underdeveloped, underweight. The head circumference was also—[J.I.M.] was not in the percentile he needed to be in. He has gained at least three pounds. He grew three inches as well. He is learning left and right shoes, left and right feet, his hands, his fingers, his toes. He loves to say that he is a cowboy. He loves to say, "yee-haw" and flicks his finger around.

According to Sarah M., when the children came into her care, they lacked facial expression, were "very introverted," and "struggled to interact with others." She and her husband have been working with

J.I.M. on his social skills: "At daycare, we do get reports that he tries to hit and beat other kids, and then [the daycare workers] redirect that as well. [J.I.M.] gets typical consequences for a three year-old, but he's—he's doing amazing." When J.I.M. first came into her home, he was very shy and scared, but now he "talks a million miles a minute." "He is constantly laughing and playing and singing." Sarah M. testified that J.I.M. "doesn't sleep all night." "He screams, and he has night terrors." When asked if J.I.M. talks about his mother, Sarah M. replied, "No."

Sarah M. testified that the baby, A.A.M., "still does not sleep throughout the night" and "wakes up four or five times." A.A.M. has "tremors." Sarah M. noticed the tremors when A.A.M. first came into her home:

She shakes, like she is scared all the time, and she can be sitting there eating, playing with other children ... [T]he daycare noticed it. They brought it to my attention, "[Sarah M.], have you noticed that she does this?" I said, "Yes, I'm glad that you noticed it." We annotated it, and the doctor's going to address it in the next couple of weeks if it continues to persist.

Sarah M. testified that she and her husband were meeting the children's needs. According to Sarah M., the children were going to "need continuing therapy" and J.I.M. was going to "need behavioral therapy, counseling, and crisis intervention when he gets older." "[I]f these self-injurious behaviors persist, then he is going to need intervention." Sarah M. testified that A.A.M. is going to "need physical therapy" because she is "struggling to walk." "[S]he is going to need physical therapy within the next couple of months if she doesn't start walking."

Sarah M. testified that she and her husband would "love to adopt" both children. Sarah M.'s plan for the children would be

to "see them become successful in their future." "I want a successful future for them. I take care of them as if they are my own. I love them to death. They're amazing."

After hearing all the evidence, the trial court signed an order terminating Dessarae M.'s parental rights to J.I.M. and A.A.M. In the order, the trial court found that Dessarae M.'s parental rights should be terminated pursuant to sections 161.001(b)(1)(E) and 161.001(b)(1)(M) of the Texas Family Code because

(1) Dessarae M. had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children; and

(2) Dessarae M. had her parent-child relationship terminated with respect to another child based on a finding that the mother's conduct was in violation of section 161.001(b)(1)(D) or (E) of the Texas Family Code, or substantially equivalent provisions of the law of another state.

The trial court also found that termination of Dessarae M.'s parental rights was in the best interest of the children. On appeal, Dessarae M. argues only that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of the children.

## DISCUSSION

Parental rights may be terminated only upon proof of clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1) of the Texas Family Code, and (2) termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(b) (West Supp. 2016). On appeal, Dessarae M.

does not contest the findings made by the trial court pursuant to section 161.001(b)(1). Her only argument on appeal is that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in J.I.M. and A.A.M.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2) (West Supp. 2016).

■ When the legal sufficiency of the evidence is challenged, we look at all the evidence in the light most favorable to the trial court's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* (citation omitted). "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (citation omitted). "If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *Id.* at 344-45 (citation omitted).

■ When a parent challenges the factual sufficiency of the evidence on appeal, we look at all the evidence, including disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm

belief or conviction, then the evidence is factually insufficient." *Id.* (citation omitted). In reviewing termination findings for factual sufficiency, we give due deference to the factfinder's findings and do not supplant its judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

■ Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, there is also a presumption that when the court considers factors related to the best interest of the child, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a) (West Supp. 2016). And, in determining whether the child's parents are willing and able to provide the child with a safe environment, the court should consider the following:

(1) the child's age, and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the

child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with (A) minimally adequate health and nutritional care, (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment, (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b).

▮ In addition, courts may consider other nonexclusive factors in reviewing the sufficiency of the evidence to support the best interest finding, including (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody, (5) the programs available to assist those persons seeking custody in promoting the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exhaustive. *Id.*

In support of her argument that the evidence is legally and factually insufficient to support the trial court's best interest finding, Dessarae M. argues that she has "made sure to maintain a stable home for her and her children" and that she has "her own vehicle to use as transportation." She points to having participated in parenting classes and engaging in group and individual counseling. Dessarae M. also claims that her "short stature made it impossible for her to have committed the alleged abuse that began this case." She claims she "could not have reached either child, let alone one of the children's face, without letting go of the steering wheel and crashing." She stresses that the report from the forensic interview "concluded only that [J.I.M.] had been physically and recently struck, and did not identify who or what had or may have physically struck him, nor did it rule out the possibility that he fell or had physically struck himself." Dessarae M. emphasizes that at trial, she testified she had not struck J.I.M. and had told the officer "that she had proof on her phone that [J.I.M.]'s facial bruising came from a fall the day before at her friend Amanda's home."

Dessarae M. also argues that the "only act suggesting that the existing parent-child relationship is improper is the allegation that [Dessarae M.] slapped one of her children from the front seat of her car while driving." Dessarae M. thus suggests that the allegation against her is that she slapped J.I.M. a single time while driving. However, the evidence at trial was that Dessarae M. was driving erratically by swerving between lanes and was *repeatedly* striking J.I.M. Further, Officer Becerra testified that he saw Dessarae M. and her children in the car and both children were crying. According to Officer Becerra, there was no car seat for two-year-old J.I.M., and J.I.M. had a red face and a cut underneath his eye. The report from the forensic interview concluded that J.I.M. had been struck that day.

There is also evidence that this incident was not the first time Dessarae M. had physically abused her children. In three previous termination proceedings spanning over eleven years, Dessarae M.'s parental rights had been terminated with respect to four other children. With respect to one of these children, Dessarae M. was accused of slapping him and leaving red marks on his body. In all three prior termination proceedings, Dessarae M.'s rights were terminated because she was found to have endangered her children. When asked about these previous cases resulting in the termination of her parental rights, Dessarae M. blamed others for the injuries suffered by her children and claimed she had sufficiently changed her behavior by hiring a new babysitter, the same babysitter she claimed was the cause of J.I.M.'s facial injury. Based on the evidence at trial, the trial court could have reasonably concluded that Dessarae M. had physically abused her children in the past, had repeatedly hit J.I.M. in this case, and would continue a pattern of physical abuse in the future. *See In re D.M.*, 452 S.W.3d 462, 471-72 (Tex.

App.—San Antonio 2014, no pet.) (explaining that a factfinder in a termination case "may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent").

There is also evidence that when J.I.M. was placed with his aunt, he was engaging in self-injurious behaviors, including hitting himself, banging his head on the wall, and hitting A.A.M. This behavior continued at daycare where J.I.M. hit other children. His aunt, Sarah M., testified that at the time J.I.M. and A.A.M. came into her care, they were developmentally delayed and underweight. They were introverted and "struggled to interact with others." Both children suffered from night terrors. A.A.M. also had noticeable tremors and shakes. There is evidence both children were going to need continued physical and emotional therapy.

There is also evidence that the children's aunt, Sarah M., is very qualified to help the children. Sarah M. testified she has a bachelor's degree in psychology and a master's degree "in marriage and family therapy, human services." Sarah M. testified that the children were happy and flourishing in her and her husband's care. According to Sarah M., J.I.M.'s destructive behaviors were being addressed and were improving. J.I.M. was learning his alphabet and numbers. J.M. was engaging in speech therapy and speaking in full sentences. He was also gaining weight and working on his social skills. The caseworker, Craft, testified that the children were happy and settled in at Sarah M.'s home. Craft testified that J.I.M. was excited to show her "his home" and "his dogs." Craft testified that J.I.M. was bonded with Sarah M. and her husband, referring to them as "mom and dad." Sarah M. testified that she and her husband would love to adopt the children, and Craft confirmed this pos-

sibility, explaining that Sarah M. and her husband have a plan for the children's future and appear capable of meeting the children's current and future needs.

Finally, we note that although Dessarae M. emphasizes that no evidence exists regarding many of the *Holley* factors, a court is not prohibited from reasonably forming a strong conviction or belief that termination is in a child's best interest simply because there may not be evidence of one or more *Holley* factors. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Thus, whether we look at all the evidence in the light most favorable to the trial court's finding, or whether we look at all the evidence, including disputed or conflicting evidence, we conclude the trial court's best interest finding is supported by sufficient evidence. *See In re J.O.A.*, 283 S.W.3d at 344-45 (stating legal and factual sufficiency standards).

We therefore affirm the trial court's order terminating Dessarae M.'s parental rights to J.I.M. and A.A.M.