

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00311-CV

_____

IN THE INTEREST OF A.R., A.R., AND A.R., CHILDREN

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. 12850-JR-B

Before Gabriel, Kerr, and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

Appellant S.R. (Father) appeals the trial court's judgment terminating his parental rights to his three children, A.R., A.R., and A.R. In two issues, Father argues that the evidence is legally and factually insufficient to support the trial court's findings supporting termination. We disagree and affirm the trial court's judgment.

## Background

Father and M.E. (Mother) are the parents of three children who were born in February 2012, January 2014, and December 2014. Mother has a long history of abusing alcohol and using illegal drugs, and she has been unsuccessfully discharged from drug rehabilitation on multiple occasions. Mother and Father have never lived together; theirs was a three-year "on-again/off-again" relationship while Mother was married to another man, with whom she also has children. The children have never lived with Father and before removal had only lived with Mother, her husband, or Mother's husband's mother. According to Mother, Father had "minimal contact" with the children, but according to Father, he "spent time with them every day" while he lived in Wichita Falls and remained in contact with them through Mother for some time thereafter.

In 2013, a court ordered Father to pay child support for the oldest child. In 2014, while Mother was pregnant with the youngest child, Father moved to Dallas. He stopped paying child support in March 2015 and immediately thereafter, in April

2015, moved to Mexico.[1] He has not seen any of the children since and has never met his youngest child.

About a year before the children's removal in January 2017, the Department of Family and Protective Services (the Department) opened a case to investigate their care in Mother's home. At some point during that investigation, Mother placed the children with one of her relatives.

In January 2017, the Department filed a petition asking for termination of Mother's and Father's parental rights to the children if their reunification with the children could not be achieved. To the petition, the Department attached an affidavit stating that Mother had tested positive for illegal drugs in 2016; that she had placed the children with a relative; that she had not thereafter remained sober; and that in January 2017, Mother's relative informed the Department that she was unable to continue caring for the children. The trial court appointed the Department as the children's temporary sole managing conservator. From the time the children were placed in foster care on January 25, 2017, Father has had no direct contact with them, but the Department has not prevented him from doing so.

In March 2017, the Wichita County District Attorney's office sent letters to the Mexican embassy in Washington, D.C. and the Consul General of Mexico in Dallas, indicating that a suit had been filed regarding the oldest child and seeking assistance in

---

[1]Father, who was born in Mexico, was not deported. He told the person who performed the home study on his Mexican residence that he had gone back home to care for his sick mother.

locating Father.[2] That July, Alyssa Johnston, a supervisor with Court Appointed Special Advocates (CASA), spoke to Father via video chat. Father was aware that the children had been in the Department's care, and he did not want his rights terminated. Nevertheless, Father did not attempt to contact the Department or the children. In fact, when Omarion Bradford, a conservatorship worker for the Department, attempted to contact both Father and a woman who claimed to be married to Father through Facebook messenger,[3] Father and the woman responded by deleting their Facebook accounts.

In January 2018, about a year after the Department filed its petition, Mother voluntarily relinquished her parental rights to the children, and the trial court signed an order terminating her rights. Afterwards, in that same month, Father walked into the Mexican consulate in Aguascalientes, which began facilitating contact between Father and the Department. Thereafter, Father completed some of the services in the service plan, including a psychological examination, drug test, home study, and at least a partial criminal background check.[4] The Department nevertheless moved forward

---

[2]The office followed up with a similar letter in July 2017, and a letter regarding all three of the children in early January 2018. The only physical address the Department had for Father was in Wichita Falls; it did not have a physical address for Father in Mexico, only a town and state location.

[3]Photographs of the children at the CPS office were posted on Father's Facebook page.

[4]The background check appears to be limited to records in the state of Aguascalientes.

with termination of Father's parental rights to all three children. Days before the dismissal deadline, an associate judge began a trial on the Department's petition to terminate Father's parental rights. *See* Tex. Fam. Code Ann. § 263.401(a).

At the beginning of the trial, Father's counsel requested a continuance because Father could not attend the trial at that time. Counsel told the associate judge that his interaction with Father had been limited but that a continuance would allow Father to participate in the trial. The Department and the children's attorney ad litem opposed the continuance. The associate judge found that Father had "not made much of a concerted effort" to attend the trial and denied the continuance. The trial before the associate judge occurred on July 20, 2018 and on August 3, 2018. Father did not attend the trial on either date.

After hearing the parties' evidence and arguments, the associate judge terminated Father's parental rights to the children. The judge found that termination was in the children's best interest and that Father had voluntarily left them alone or in the possession of another and had remained away for a period of at least six months without providing adequate support, had constructively abandoned them, and had failed to comply with provisions of a court order that established the acts necessary for him to obtain their return after they had been removed from his legal custody for abuse or neglect.[5]

---

[5] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(C), (N), (O), (2).

Father asked for a de novo hearing before the trial court.[6] At the de novo hearing, his counsel again requested a continuance. The trial court denied the continuance, considered the evidence that the parties had presented to the associate judge, and terminated Father's parental rights to the children on the same grounds. Father brought this appeal.

## Evidentiary Sufficiency to Support Termination

On appeal from the trial court's judgment terminating his parental rights to his children, Father raises two issues. First, he argues that the evidence is legally and factually insufficient to prove a ground for termination under section 161.001(b)(1) of the family code. Second, he contends that the evidence is legally and factually insufficient to support the trial court's finding under section 161.001(b)(2) that termination of his parental rights is in the children's best interest.

### Standards of review and applicable law

We carefully scrutinize termination proceedings in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012). Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), .206(a); *E.N.C.*, 384 S.W.3d at 802. Due process demands this heightened standard because a parental termination proceeding affects a value far more precious than any property right. *E.R.*, 385 S.W.3d at 555. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or

---

[6] *See id.* § 201.015.

6

conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child under section 161.001(b)(2). *Id.* § 161.001(b); *E.N.C.*, 384 S.W.3d at 803.

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved the challenged ground for termination. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *Id.* When credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* The factfinder is free to accept or reject all or part of the testimony of any witness. *See In re L.B.*, No. 10-17-00279-CV, 2018 WL 1415736, at *2

(Tex. App.—Waco Mar. 21, 2018, pet. denied) (mem. op) (citing *In re C.E.S.*, 400 S.W.3d 187, 195 (Tex. App.—El Paso 2013, no pet.)).

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief of the challenged grounds for termination. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

**The trial court's "abandonment" finding under section 161.001(b)(1)(C)**

In his first issue, Father argues, in part, that the evidence is legally and factually insufficient to support the trial court's finding under section 161.001(b)(1)(C) that he voluntarily left the children alone or in the possession of another and remained away for a period of at least six months without providing for their adequate support. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(C). Courts commonly characterize this ground for termination as "abandonment." *Jordan v. Dossey*, 325 S.W.3d 700, 726 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

On appeal, Father does not dispute the sufficiency of the evidence to prove that he voluntarily left the children in Mother's possession and remained away for at least six months. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(C). He argues only that the

8

Department did not prove that he failed to provide adequate support for the children. *See id.* He contends that the law allowed him to "arrange for the children's support by another person," and he asserts that the Department did not prove that Mother did not have sufficient resources to support the children.

Johnston, the CASA supervisor, became involved with the children upon their removal from Mother's custody in January 2017. Mother told Johnston that during Mother's pregnancy with her third child, Father moved away first to Dallas and then to Mexico, and he never saw them again thereafter.[7] Johnston testified that when she spoke with Father in July 2017 through a video chat,[8] he did not ask about the children's welfare or state that he was financially supporting them. According to Johnston, Father knew that he had been ordered to pay child support, but he did not ask her about any manner in which he could support the children. Although before March 2015, Father had paid approximately $3,000 in child support for the oldest child, he made no payments after March 2015, and at the time of the trial before the associate judge, he owed approximately $14,000. In answering a questionnaire, when asked what financial support he had provided to the children since leaving Texas, Father stated that he had not provided any support because he had "no way."

---

[7]Father confirmed in his psychological examination that he had not seen the children since moving home to Mexico. But he also stated in both his psychological evaluation and home study that he stayed in contact with them until he "suddenly" could not reach them and Mother would not answer her phone.

[8]Johnston mostly speaks English and Father mostly speaks Spanish, so Mother helped as a translator.

9

According to Bradford, Father never explained why he failed to maintain contact with the children or why he did not financially support them.

From this evidence, the trial court could have rationally found by clear and convincing evidence that Father did not on his own accord provide adequate support for the children. Father contends, however, that "adequate support" may include "making arrangements for adequate support rather than personally supporting the children" and that the Department did not prove that he did not do so when he left the children with Mother.

Under section 161.001(b)(1)(C), a parent may provide for a child's support by making arrangements for their support rather than by personally providing support. *See Holick v. Smith*, 685 S.W.2d 18, 21 (Tex. 1985). Thus, when the caregivers of a child do not expect a parent's support and are themselves providing support, a trial court cannot terminate the parent's parental rights under subsection (b)(1)(C) because of the parent's failure to provide support. *See id.*

But here, unlike in *Holick*, there is no evidence that when Father left the children with Mother, she was able to support them or expected to do so without his assistance. *See id.* at 19–21. Rather, the trial court received evidence that Mother has never held a full-time job, a fact that the court could have reasonably inferred Father knew from his three-year relationship with her.[9] The trial court also received evidence

---

[9]Regardless of the "on-again/off-again" nature of their relationship, it did result in the conception of three children.

establishing that before Father abandoned the children, a court ordered him to pay child support while naming Mother as the obligee and that he paid some support through March 2015, indicating that Mother expected support and did not waive her entitlement to it. Although Father asserts that the evidence does not disprove that despite Mother's lack of full-time employment, she provided adequate financial support for the children in his absence, the evidence summarized above proves that Father did not either make arrangements for the children's adequate support or personally support them, which is what subsection (b)(1)(C) requires. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(C); *Holick*, 685 S.W.2d at 21; *R.M. v. D.R.*, No. 03-17-00605-CV, 2018 WL 1163006, at *4 (Tex. App.—Austin Mar. 6, 2018, no pet.) (mem. op.) (affirming a subsection (b)(1)(C) finding because there was no evidence that the parent "made any arrangements to provide . . . assistance or that he had reached an agreement with [the caregivers] that no such assistance was needed"); *In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *5 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (distinguishing *Holick* on the ground that unlike in *Holick*, there was "nothing in the record to indicate that [the parent] had an agreement or an understanding with [the caregiver] that [the caregiver] would take care of the children without any assistance or support"); *Jordan*, 325 S.W.3d at 728 ("[U]nlike in *Holick*, there was no understanding between Akin and Jordan that Jordan would not be sending support because Akin could provide adequate support on his own."); *see also H.R.M.*, 209 S.W.3d at 110 (discussing another ground for termination under section

11

161.001(b)(1) and explaining that cases discussing a parent's "provision of support through other people contemplate that . . . someone . . . has agreed to assume the . . . parent's obligation to care for the child"); *In re C.J.A.*, No. 13-16-00635-CV, 2017 WL 2200301, at *2 (Tex. App.—Corpus Christi–Edinburg Mar. 16, 2017, no pet.) (mem. op.) (applying the reasoning of *H.R.M.* to subsection (b)(1)(C)). Indeed, the court order to provide support for one of the three children is a judicial finding that no such arrangement existed as to that child, even before the birth of the third child created the need for additional support.

For these reasons, we hold that the evidence is legally and factually sufficient to support the trial court's "abandonment" finding under section 161.001(b)(1)(C). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(C); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573. Because section 161.001 requires the Department to prove only one subsection (b)(1) finding, we decline to address the sufficiency of the evidence to support the trial court's other (b)(1) findings, and we overrule Father's first issue. *See* Tex. R. App. P. 47.1; *In re G.H.*, No. 02-18-00080-CV, 2018 WL 3968788, at *9 & n.15 (Tex. App.—Fort Worth Aug. 16, 2018, no pet.) (mem. op.).

**Best interest under section 161.001(b)(2)**

In his second issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

12

We review the entire record to determine a child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).

Nonexclusive factors that a factfinder may use in determining a child's best interest include the child's desires, the child's emotional and physical needs now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"). These factors are not exhaustive. *C.H.*, 89 S.W.3d at 27. And although some listed factors may not apply to some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

13

The trial court could have rationally found that Father's acts and omissions proved that he did not have a proper relationship with his three children, that he was not interested in meeting their emotional and physical needs, and that he was not willing to give them a stable future. *See Holley*, 544 S.W.2d at 372. As explained above, Father has not seen the older two children since moving to Dallas, nor has he paid court-ordered child support for the oldest child since leaving for Mexico. And he has never met his youngest child.

During his conversation with Johnston in 2017, Father did not ask about the children's welfare or claim that he had attempted to locate them after moving to Mexico. He also did not express any plans that he had for them at that time.[10] During that conversation, Father did not ask about what services he could complete to maintain his relationship with the children, ask Johnston to arrange his visitation with them in the United States or in Mexico, or explain why he had not seen them since 2015. Father also told Johnston that he believed the children would be safe with Mother, but he told the psychological examiner that when his relationship with Mother deteriorated, "she began going out with her friends and ignoring the [children]."

Bradford, the Department's conservatorship worker, testified that Father never asked to visit with the children, never sent any correspondence to them, and never

---

[10]In response to a January 2018 questionnaire from the Department, Father expressed that he wanted the children to live with him and his family, to study, and to go to church.

14

financially supported them after January 2017. Although Father indicated in his psychological examination and home study that he was able to maintain contact with the children even after he returned to Mexico until Mother stopped answering her phone, Bradford testified that Father never had problems contacting Mother by phone. And Father never explained why he never attempted to send the children cards or letters, which Bradford testified was easy to do from Mexico.

The trial court also could have found that reuniting the children with Father was not in their best interest because he failed to prioritize them even after learning that his parental rights were at risk, as evidenced from his failures to maintain contact with the Department and to comply with all of the services aimed at promoting the children's best interest. *See id.*; *In re V.T.E.*, No. 10-17-00310-CV, 2018 WL 1097256, at *4 (Tex. App.—Waco Feb. 28, 2018, no pet.) (mem. op.) (considering a parent's lack of contact with the Department in a best-interest review); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (stating that a parent's failure to comply with a service plan supports a finding that termination is in the best interest of the child). Bradford testified that Father had his cell phone number and his address and that Father never contacted him.[11] Similarly, Johnston testified that Father never contacted her after their lone conversation in 2017.

---

[11]The Mexican consulate acted as an intermediary for communication between Father and the Department and facilitated Father's completion of some of the requirements of his service plan.

Johnston acknowledged that Father had completed parts of his service plan[12] but explained that he had failed to comply with other parts because, among other failures, he had not written letters to his children, had not completed regular drug tests, had not completed counseling, and had not completed parenting classes. Bradford testified that Father did not take steps toward reuniting with the children

---

[12]For example, Father completed a psychological evaluation. The person who evaluated Father stated that he has coherent and rational thought processes, that he possesses analytical abilities, and that his vocabulary is appropriate. Bradford testified, however, that Father lied during the psychological evaluation by stating that he had talked with the children six months beforehand.

Johnston acknowledged that the psychological evaluation's overall assessment was that there was no barrier to reuniting Father with the children. But she expressed concerns about the manner in which Father completed the psychological evaluation:

> [T]here's an indication by the person who wrote the psychological that . . . there's a high rate of infrequency in answering the questions, and either he has many doubts or he lacks reading skills. And so . . . the information garnered can't be used to assess things like personality factor . . . .
>
> They couldn't do things like assess his communication module[;] his family relationships module[;] [his] sexuality module, which . . . provides appropriate information about topics related to sexuality for the different stages of a child's life in order to prevent them from suffering sexual assaults of a sexual nature and to encourage children to show respect for the sexuality of others[;] and the family tools module which talks about the types of care parents provide for their children, identif[ies] strategies they use to guide and correct them and resolve conflict[,] and encourages the use of parenting strategies and techniques based on understanding positive parenting, negotiation[,] and setting appropriate limits.
>
> So the fact we could not get results on any of that, we have no idea of what kind of parent he's going to be.

until he learned that Mother's parental rights had been terminated. Regarding the timeline of Father's attempts to reunite with the children, Bradford testified,

> The kids came into care in January of 2017. . . .
>
> [Father] stated in the home study that he found out a few months after the kids were in care . . . . So we can say a few months, April. Let's say April of 2017.
>
> So in April of 2017 . . . [Father] had an opportunity . . . to take the same steps that he took in January of 2018 to go into an office and say I have children who are in foster care and I want to see what I can do to get them back. At that time, he did not do that. He waited a whole year later, in January [2018], to say now I want to be a dad for these kids.
>
> At that time, he hadn't been sending any support for these children or anything, [and] the Department in the State of Texas had been taking care of these children for over a year[.]

Because of Father's absence, the children do not appear to have any bond with him,[13] and they have never met his family, with whom they would be living. *Cf. In re C.D.S.*, No. 02-11-00516-CV, 2012 WL 2135592, at *3 (Tex. App.—Fort Worth June 14, 2012, no pet.) (mem. op.) ("A child's limited conscious knowledge of the parent, demonstrating a lack of the bond that the child has with the parent, may . . . affect the child's best interest in terminating the parent's rights."). Johnston testified that during her conversations with the children, they did not refer to Father as their father. Foster Mother testified that the children, who primarily speak English and know possibly only a few words in Spanish, have never mentioned Father and that Father never

---

[13]The children's Foster Mother testified that the children thought Mother's husband was their father and that the three-year old likely thought Foster Mother was her biological mother.

17

attempted to contact them. Charlotte Marsh, a licensed marriage and family therapist, testified that the children had never spoken to her about Father. Bradford testified that he had never heard any of the children mention Father.

Next, the trial court could have rationally favored the Department's plans for the children, which were in accord with the children's desires—*see Holley*, 544 S.W.2d at 372—over Father's plans for them. The foster parents want to adopt all three children. The oldest child had told Foster Mother that she was "super excited for [Foster Mother] to go talk to the judge so that [she] could be her mom." The four-year-old child told Marsh "spontaneously" that she wanted Foster Mother to "fight for [her] so [she could] be adopted." And Johnston testified that she had talked with all three of the children, and they wanted to be adopted by their foster parents. In fact, they had asked her multiple times whether they were going to be adopted and were "nervous because it[ had] been so long already."

When Marsh was asked about the permanency that the children could receive from their foster family, she testified,

> Permanency means that they're not going to have . . . to leave their home. . . . They have each other. Permanency means . . . that these are their parents . . . . Permanency means they don't have to go to bed at night worrying about where they're going to be tomorrow.
>
> . . . .
>
> . . . These children need to know that their mom and their dad will be their . . . mom and dad forever.
>
> . . . .

18

[The children] love and respect [their foster parents]. Whenever they think of their family, that's who they think of as their family is the [foster parents]; the older brothers, the adopted son, that is their family. When they talk about family, they are not referring to their biological family. They're talking about their permanent family, which is the [foster family].

Bradford testified that he had visited the children in their foster placement and that he had no concerns about physical aspects of their residence. He testified that the children are bonded to their foster parents and view them as their mother and father. *Cf. In re U.P.*, 105 S.W.3d 222, 230–31 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g) (considering a child's bond with a foster family as a factor supporting the child's best interest in the termination of a father's parental rights).

Foster Mother testified that she saw positive changes in the children's personalities from the time they began living in her home until the time of trial. *Cf. In re J.I.M.*, 517 S.W.3d 277, 286–87 (Tex. App.—San Antonio 2017, pet. denied) (mem. op.) (considering in a best-interest review that a child's condition improved after his removal from his mother's home and after his placement in his aunt's home). She explained that one of the children used to have a scared and quiet demeanor but that the child now "[a]lways has a smile on her face . . . and . . . just loves life." Foster Mother testified that a second child who was nervous upon entering foster care became happy and "very comfortable around people." Foster Mother testified that she provides the children with stability and that they "mean the world to [her]."

Johnston testified that CASA supported the children's adoption by their foster parents, with whom the children were "closely bonded." *Cf. U.P.*, 105 S.W.3d at 231 (considering CASA's recommendation as supporting the child's best interest). She explained that the children viewed their foster parents as "mom and dad." She testified that she supported the termination of Father's parental rights because he had not "made a consistent . . . effort to have a relationship with [the] children. [The foster parents] have had them in their home for over a year. They are very happy and bonded there, and they've indicated they want to be adopted . . . ."

If reunified with the children, Father planned for them to live with him in Mexico with his parents and with his adult brother. A social worker who completed a home study in Mexico[14] recommended that the children return to Father's care because he is a family member, because he is young, and because he is "able to care for his" children. And the home study concluded that the four-bedroom home was

---

[14]In several respects, this home study was unusual as compared to home studies completed in Texas. Johnston testified that while social workers who complete home studies here interview each person who lives in a proposed household, there was no indication from Father's home study that the social worker interviewed anyone other than Father. Next, while home studies here are usually accompanied by letters of recommendation concerning the children's placement in a home, Father's home study did not contain such letters. Johnston further testified that while information concerning a parent's income in a home study is usually confirmed through a pay stub or another document, nothing in Father's home study confirmed his statement that he had legal employment. Finally, Bradford testified that he never received calls from the social worker who completed the home study asking about Father's background information.

"clean and orderly," had "the necessary utilities and furnishings," and had adequate space and privacy for the children.

But Marsh testified that moving to Mexico would be detrimental to the children, explaining,

> They would be leaving the family that they've been bonded and attached to for a year and-a-half. They would be going to people that have shown no interest in them as far as their well-being or upbringing or financial or emotional health. They would be set . . . with caregivers they are totally unfamiliar with. . . . Everything that they've ever known in their life would change in a day and that would be detrimental to the child[ren].
>
> . . . .
>
> . . . It would be traumatic to take them from here . . . and send them there for reunification because then we've taken everything that they know and taken it away from them, introduced them to someone who they don't know and don't acknowledge as a father and expect them to acclimate to him. He should acclimate to them.
>
> He's had, in my opinion, plenty of time to come here and get to know these children.

Marsh also expressed that she had diagnosed the children with emotional trauma and that moving to Mexico would be traumatic for them.

Similarly, Johnston expressed concern about returning the children to Father in Mexico:

> He has not provided any kind of financial support to them . . . since he's been in Mexico, and I know that is possible. . . . [I]t shows in the home study they have an excess of funds . . . . It even states in the home study his family makes an above average income. He certainly could send money . . . . He does not have any kind of plan for how to . . . build a bond with his children . . . once [they are] placed with him. He doesn't know of any services and his plan is just to spend time with them.

21

These children have been through a lot. They are going to need counseling services, potentially now and in the future. They're going to need educational help.

Bradford acknowledged that returning the children to Father's care in Mexico and monitoring their circumstances there was an alternative to terminating Father's parental rights. When Father's attorney asked Bradford what the "hold up" was for returning the children to Father and monitoring their care in Mexico, he answered, "[Father] hasn't shown any interest for his children. . . . [Father] has . . . been knowing about this for over a year. . . . [Our goal] started out . . . as family reunification, but . . . changed since [Father] didn't show any interest for his children." Bradford testified that none of the other adults living with Father in Mexico had contacted him seeking placement of the children with them.

Based on all of these facts and the remaining evidence in the record, although we generally presume that maintaining a parent-child relationship is in a child's best interest and although some evidence weighs against the trial court's termination decision, we hold that the trial court could have rationally reached a firm belief or conviction that termination of Father's parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *E.N.C.*, 384 S.W.3d at 802; *Holley*, 544 S.W.2d at 372.

**Issues Raised in Reply Brief**

Father raises new issues in his reply brief, particularly whether the trial court abused its discretion by admitting evidence suggesting Father knew about Mother's

drug use and a police report indicating that Father had physically assaulted Mother in Wichita Falls. We normally do not review issues raised for the first time in a reply brief. *Hulcher Servs., Inc. v. Emmert Indus. Corp.*, No. 02-14-00110-CV, 2016 WL 368180, at *6 n.18 (Tex. App.—Fort Worth Jan. 28, 2016, pet. denied) (mem. op.). But even if we do so here in our discretion, we conclude that any error would be harmless. Not only did some witnesses testify about Mother's drug use and Father's possible abusiveness without objection, the trial court declined to terminate Father's parental rights on endangerment grounds, and the evidence unrelated to Mother's drug use and any possible abusive behavior by Father is sufficient to support the trial court's abandonment and best-interest findings. *See* Tex. R. App. P. 44.1(a)(1).

Additionally, the reply brief, like Father's opening brief, focuses extensively on (1) the Department's perceived failures in attempting to contact Father and facilitate his completion of services and (2) on the potential difficulty for Father in contacting the children from Mexico. But the evidence supports a conclusion that

- although Father was able to complete many services sufficiently through the Mexican consulate, he did not even begin to attempt completing services until after Mother's rights had been terminated,

- Father could have communicated by Facebook or mail and chose not to, and

- Father also could have reached the Department through Mother had he wanted to.

23

Balancing all of the enumerated best-interest factors—and declining to focus in isolation on any one factor—we conclude that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573. We overrule Father's second issue.

## Conclusion

Having overruled both of Father's issues, we affirm the trial court's judgment terminating his parental rights to A.R., A.R., and A.R.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: March 14, 2019