# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00790-CV
## NO. 03-24-00798-CV

---

**C. C., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 207TH DISTRICT COURT OF COMAL COUNTY,
NOS. C2023-0249-B & F2024-0243E,
THE HONORABLE MELISSA MCCLENAHAN, JUDGE PRESIDING[1]**

---

## M E M O R A N D U M   O P I N I O N

C.C. (Mother) appeals the trial court's final orders terminating her parental rights to M.J.O., M.O., and M.J.F. on four statutory grounds and finding that termination of her rights is in each child's best interest.[2]  *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (F), (O), (2). Mother challenges the sufficiency of the evidence supporting these statutory grounds and the best-interest finding as to each child. We will affirm the trial court's final orders.

---

[1]  The parties waived a jury trial, de novo hearing, and any objection to the associate judge of the Child Protection Court of Central Texas who tried these cases. *See* Tex. Fam. Code § 201.2041(a) (authorizing associate judge's proposed order or judgment to "become[] the order or judgment of the referring court by operation of law without ratification by the referring court" when "the right to a de novo hearing before the referring court is waived").

[2]  We protect the children's confidentiality by referring to them and their family members using initials. *See id.* § 109.002(d); Tex. R. App. P. 9.8.

## BACKGROUND

Mother's children, M.J.F., M.J.O., and M.O., were ages five, four, and two respectively when trial began in the underlying cases seeking termination of her parental rights. The cases were tried to the bench on August 9, 2024; October 11, 2024; and October 25, 2024.[3] During trial, the court heard police testimony that Mother, the three children, and N.O. (father of M.J.O. and M.O.), were involved in a November 2022 traffic stop that resulted in N.O.'s arrest for driving with a suspended license and without insurance. All three children were back-seat passengers, but only two of them were restrained in car seats. When Mother was out of the car and speaking with police, she was emotional, crying, and "very insistent" that police not look into the car. She was also "very desperate" for a diaper bag and did not want it near the officers.

During a pre-tow inventory of the vehicle, police found drug paraphernalia and multiple baggies containing a white, powdery substance.[4] The baggies were on the driver's side floorboard, the backseat floorboard, and in an unzipped wallet sticking out from an open diaper bag on the backseat floorboard. The drug paraphernalia—a small straw—was in a baggy inside the wallet. Police testified that the baggies and diaper bag would have been accessible to the child who was not in a car seat. Mother testified that she and N.O. were "pulled over" on the way to pick up a car seat from a friend and that she had "no problem" with a vehicle search but wanted the diaper bag because it had formula she needed to feed her baby. She also testified that the wallet and straw were hers, while the suspected drugs belonged to N.O. and her.

---

[3] The children's fathers are not parties to these appeals. N.O. signed an irrevocable affidavit before trial voluntarily relinquishing his parental rights to M.J.O. and M.O. *See* Tex. Fam. Code § 161.103. B.W. was adjudicated M.J.F.'s father after genetic testing and, at the end of trial, was appointed M.J.F.'s sole managing conservator. M.J.F.'s case was severed from the one involving M.J.O. and M.O., who remained in the Department's conservatorship.

[4] Evidence at trial did not include any lab-test results for substances found in the car.

**Petition to require participation in services**

The day after the traffic stop, the Department received a police report about the incident and offered family-based safety services (FBSS) to Mother, which she refused. The FBSS worker assigned to Mother and N.O. in late 2022 testified that the case was referred to her "due to concerns for drug use and drug paraphernalia that was found," which she recalled was "marijuana and cocaine paraphernalia." After FBSS made several unsuccessful attempts over the next couple of months to engage Mother and N.O. in services, the Department filed a petition and a supporting affidavit for a temporary order requiring their participation in those services.

Mother agreed to complete a urinalysis before going to court. Before that test, the FBSS worker was mistakenly included in a group-chat text message between Mother and N.O. in which N.O. discussed purchasing fake urine. Mother then called the FBSS worker denying "knowledge of that," but the FBSS worker was concerned that her inclusion in this text message, which was intended only for Mother and N.O., may have changed Mother's response to the suggestion about purchasing fake urine.

The trial court convened a hearing on the Department's petition to require participation in services; ordered hair-follicle drug testing of Mother, N.O., and the children; and ordered that the case would be upgraded to one seeking the children's removal if they tested positive. On February 23, 2023, drug-test results for samples collected on February 15, 2023, showed that M.J.O. tested positive for cocaine, cocaine metabolite, marijuana, and marijuana metabolite; M.J.F. tested positive for cocaine, cocaine metabolite, and methamphetamine; and Mother tested positive for cocaine, cocaine metabolite, marijuana, and marijuana metabolite.[5]

---

[5] Exhibits with these drug-test results were admitted into evidence at trial.

**Petition for termination, aggravated-circumstances motion, and Rule 11 agreement**

The next day, February 24, 2023, the Department filed its petition as to all three children seeking child protection, conservatorship, and termination of parental rights in a suit affecting the parent-child relationship. That day, the trial court signed an order for protection of children in an emergency that appointed the Department as the children's temporary managing conservator. The Department later moved for accelerated trial on the merits and sought an aggravated-circumstances finding. *See* Tex. Fam. Code § 262.2015 (waiving requirements of service plan and reasonable efforts to return child to parent and allowing accelerated trial schedule if court finds parent subjected child to aggravated circumstances); Tex. Penal Code § 22.041 (stating that engaging in conduct that endangers child is felony offense).

The parties entered into a Rule 11 agreement, effective March 24, 2023, suspending the accelerated-trial motion. Under the agreement admitted into evidence, the trial would be set on the normal timeline, but the Department could accelerate that setting if Mother was not in full compliance with her service plan and had any positive drug-test result. "Full compliance" was defined as "the completion of all: requests of the Department's that are laid out in the service plan, orders of the court, and requested drug tests." Also, the agreement contained

- Mother's stipulation that the evidence supported a finding of aggravated circumstances;

- Mother's waiver of a jury trial, de novo hearing, and any objection to the associate judge;

- a provision stating that if Mother tested positive for any illegal substance, she would not be in compliance, and the Department could accelerate the trial; and

- a provision stating that if Mother tested positive for any illegal substances, she would not be in compliance, and the Department would suspend visitation with the children until a clean drug test was provided or until the trial court deemed appropriate.

Mother was given twelve months to complete services.

4

**Mother's initial progress with services and changes after children returned**

Mother received a family plan of service that was made an order of the court at an April 2023 status hearing.[6] The plan, admitted into evidence, stated that Mother was unemployed before the children were removed but had since gotten a job, that she reported "using marijuana since age 14," and that she tested positive for marijuana and cocaine. The plan noted that Mother "appear[ed] to lack appropriate parenting knowledge and skills to understand and prevent the impact of using illegal substances around her children" and that "[t]he children in [her] care tested positive for methamphetamine, cocaine, and marijuana." Also, the plan listed actions necessary for the return of Mother's children, including completing an OSAR (Outreach, Screening, Assessment, and Referral) evaluation, parenting-education classes, a substance-abuse-treatment program, and a psychological evaluation; preparing a relapse plan; refraining from criminal activity; and maintaining regular employment and stable housing. Department permanency specialist Leslie Whitely testified that Mother's OSAR recommendations included attending AA meetings, but Mother denied being informed that AA attendance was compulsory.

Initially, Mother complied with her service plan. She completed parenting-education classes, her OSAR evaluation, and an outpatient substance-abuse-treatment program. Whitely testified that Mother's progress was "phenomenal" and that Mother "knocked it out of the park in the beginning." After Mother had been sober for about nine months in November 2023, the children were returned to her. But things changed within the first three months of 2024 after the children's return. Whitely testified that Mother was arrested on an outstanding warrant for a traffic-related offense and "became a little erratic in what she was doing, the people she was hanging out with, [and had] incidents with N.O."

---

[6] Also at this hearing, B.W. was adjudicated the father of M.J.F.

In January 2024, after a breakup, Mother harassed her ex-boyfriend by sending him "constant" calls and texts (some that police witnessed incoming on the ex-boyfriend's phone after Mother's number was blocked[7]), resulting in a police report. *See* Tex. Penal Code § 42.07 (harassment offense). The police officer who responded to the harassment report returned to the ex-boyfriend's home after learning that Mother said she was on her way there and that there was a warrant for her arrest.[8] The police officer testified that if Mother had arrived, she would have been arrested. In her testimony, Mother explained that she and her ex-boyfriend

> were arguing really bad. I had just found out he was cheating on me. So, I had blown up his phone to get an answer. And—yeah, that was just . . . it was just something dumb. I shouldn't have done it. And I learned my lesson from it. Don't chase after a man who doesn't want to—he won't chase after you. Don't lower myself to that standard. . . . I was just really hurting that he did that to me.

However, after this incident, she reconciled with him. They were no longer together by the time of trial, but Mother said that they "do talk a lot."

In February 2024, Mother engaged in a physical altercation with N.O., during which at least one of the children was shoved down. Phone videos of the altercation, taken by N.O.'s girlfriend, were admitted into evidence at trial. The video played during trial shows Mother walking from a parked SUV toward the front of a house, two of the children standing by the SUV, and a man later identified as N.O. picking up and carrying the third child who was walking toward the house. Mother saw N.O.'s girlfriend, and they screamed curse words at each

---

[7] A police officer testified that he instructed the ex-boyfriend to block Mother's phone number, and he saw the ex-boyfriend do that. Then, while the ex-boyfriend was still speaking with the officer, "he showed me an unknown number now calling his phone. And he was telling me that he blocked the phone number, which he did show me. And now—that she was getting around it somehow."

[8] The record does not disclose whether this warrant is the one that led to Mother's arrest.

6

other after Mother told the girlfriend not to record her. Although it seemed that Mother was there to drop off the children and she told N.O. she had "nowhere to put them," she later said she wanted N.O. to give the children to her. Mother and N.O. began cursing and then physically fighting with each other in the front yard. N.O. used his leg to sweep Mother's leg out from under her. Mother fell but got up, retrieved her phone from the SUV, said she was calling police, and followed N.O. Mother stood at the entrance to the house, and N.O., still holding one child, told Mother to leave and started pushing her. During the pushing, the two children standing near Mother and N.O. were shoved, and at least one child fell onto the concrete walkway.[9]

Mother agreed that this incident occurred three months after her completion of parenting classes in November 2023. She testified that she reached "a breaking point" caring for "those kids":

> I was doing it all by myself, really; taking care of those kids. [N.O.] wasn't helping me at all. And I was begging him to. And he just wouldn't—no matter what, would not help me. And I was—just finally got to a breaking point. The kids kept getting sick. I kept having to take off work. And as a single mom trying to support them, it was just stressful because I hadn't done that by myself yet.

She acknowledged that at the time of trial, after N.O.'s parental rights were terminated (by signing an irrevocable affidavit voluntarily relinquishing his parental rights on August 9, 2024), she was in the same single-parent situation. When asked what would prevent similar incidents, Mother said she had "been working on that" and had "more of a support system right now," including help from a grandfather, who until then had not been helping her much besides giving

---

[9] The other child was out of the camera angle.

her a place to live. Mother testified that she had lived with her grandfather for almost two years, they had "multiple conversations" about him helping more in the future, and

> [j]ust like any other family, we have little arguments. And after that one back in, I guess, what, the end of January, we both sat down and had a very long talk with each other and both agreed with each other that it wasn't right for the children to—at that time do what we were—like, arguing the way we were or—and my grandpa is very old and he was just overwhelmed.

Whitely testified about her understanding of the February 2024 altercation, which began when Mother went to N.O.'s mother's house to ask for help getting a babysitter, but N.O.'s mother was not there. Mother did not have anywhere to take the children during the day. She told Whitely that she and the children had been living at her grandfather's house, but he later told her that the children could stay there only at night to sleep. This limitation raised the Department's concern about the stability of Mother's housing. And because of the altercation with N.O., the Department was also concerned that Mother had relapsed into drug use and was not being protective of her children.

Mother testified that the day after the altercation, the children "were removed due to mine and [N.O.]'s argument—I guess, domestic violence, in front of the children." Whitely said that M.J.F. went to live with his father, B.W., while M.J.O. and M.O. went to live with their paternal grandmother for a few weeks before being moved to a shelter and then some foster homes, the last one a foster-to-adopt home. According to Whitely, M.J.F. is "doing great" with his father, while M.J.O. and M.O. are doing "phenomenal" in their foster-to-adopt home.

Whitely told the court that when M.J.O. was at his paternal grandmother's home, he had many behavioral issues that were not reported to the Department at the start of the case, including "spitting, kicking, [and] hitting" at daycare. But since being placed at the second

8

foster home and attending another daycare, M.J.O. is "not having any issues in daycare, and he's doing phenomenal," and "[M.O.] is—he's just a tro[o]per. He's a great little man."

Additionally, Whitely testified that M.J.F. is very happy and has told her that "he wants to live with Dad [B.W.]." She noted that because B.W. has other children, M.J.F. is getting to be with his other siblings. M.J.F. also looks up to his 12-year-old uncle, who plays football. B.W. testified that his fiancée also helps care for M.J.F., who seems "very" bonded to her. B.W. noticed that since being placed with him in March 2024, M.J.F. is more polite and more willing to try foods besides chicken nuggets, and M.J.F.'s teacher said during a recent parent-teacher conference that M.J.F. is doing "phenomenal" in reading and math.

Whitely noticed that during M.J.F. and Mother's most recent visits—which at the time of trial were two-hour, supervised visits every other Friday for all the children—M.J.F. did not seem to engage with her as much as he used to, and M.J.F. did not appear "as thrilled as he was [about] coming to visits." B.W. testified that although M.J.F. is a "very talkative child," after visits with Mother he does not want to talk to anybody, and he seems a little bit more wound up and irritated. When M.J.F. gets home, if he becomes upset while playing, he starts "throwing stuff." B.W. added that he does not believe Mother is capable of sobriety and healthy parenting in the future, and that termination of her parental rights is in M.J.F.'s best interest.

**Mother's positive drug tests and explanations for some of them**

The Department's concern that Mother might have relapsed around the time of the altercation with N.O. was confirmed when she tested positive for cocaine and cocaine metabolite on February 28, 2024. And Mother continued to have positive drug-test results while the suit seeking termination of her parental rights was pending. In addition to Mother's positive drug test

for cocaine, cocaine metabolite, marijuana, and marijuana metabolite at the start of the case in February 2023, and her positive drug test on February 28, 2024, for cocaine and cocaine metabolite, the evidence showed that on May 23, 2024 (after the children's second removal) and October 3, 2024 (days before trial resumed), Mother again tested positive for cocaine. Of the six drug tests in evidence, Mother tested negative twice. One was a drug test she paid for—on a hair specimen collected on March 28, 2024, a few days after she dyed her hair—and the other was a drug test on July 22, 2024. In sum, Whitely testified that Mother had no length of sobriety after February 2024, when the children were removed from her the second time.

The trial court heard a similar acknowledgement from the children's paternal grandmother, who testified that "there were some mistakes made that [are]—you know, hard to recover from." Grandmother denied thinking Mother would physically harm the children, but she noted that Mother made "some bad choices" and that "doing drugs when you have kids" is unwise. Grandmother opined that termination of Mother's parental rights is not in the children's best interest because they "deserve to be with their mom" or have her in their lives, but she was concerned about Mother continuing to test positive for the same drugs after almost two years.

When Mother testified, she agreed that her behavior in the video of the February 2024 altercation could be construed as indicating a relapse. She also agreed that she had a positive drug test around the same time that the video was made and multiple positive drug-test results during the case. When asked why she was unable to "get clean" for her children, Mother twice stated, "I have been clean." She was unsure how to show the trial court that she would never again test positive for drugs, other than to "keep paying for out-of-pocket tests."

Mother was asked on direct examination about any excuse for "these last couple of positive drug screens," and she described getting drunk at a party:

10

> I went to this stupid party[,] and I got really drunk and I slept with this guy. . . . [A]fter we got done sleeping together, he offered me to do some. And I was like, no, I don't do stuff like that. And then I eventually ended up leaving. But I was around it and I hadn't known at the time.

Mother testified that another of her positive drug tests might be attributable to her "ex" because she had gone through his cell phone and seen "some things on there that could be a reason[ ] why—it was kind of showing that he was using." She also testified that for her February 28, 2024 drug test she was sent somewhere new, an urgent care facility, and they "were just shoving [her hair sample] in the envelope" without first placing the sample into "like, a foil."

During cross-examination about her negative drug test from March 28, 2024, Mother testified initially that she knew she was not supposed to dye her hair before hair-follicle drug testing, but that she requested permission to do so, and the Department had allowed it. She later denied knowing about that prohibition and further denied that her service plan or the tests she was sent to take informed her about the prohibition against hair dyeing before taking her drug test.

Mother denied ever intentionally posing a danger to her children in the past, although she acknowledged that she might have done so by "arguing in front of [her] children," which "can hurt them emotionally" and she "should have never done." She explained that she was referring to the "[t]he video[] [and] I mean, anything in general in the past." She identified her parenting abilities as having a loving and supporting home, a good job, the ability to afford the children, and a car to get them back and forth to school and daycare. She noted that she had paid off all her tickets and needed only to renew her driver's license. She testified that if the children were returned to her, they would live with her at her grandfather's home, where they have their own rooms, their own beds, and where they had been "on and off for the past two

11

years." She also testified that her current job as a salon hairstylist offered flexible scheduling, plus alternating Saturdays and every Sunday off. Her childcare plans involved assistance from a couple of friends who offered to help her on their days off, and from the children's grandmother who would watch them every other weekend. Mother stated that the children need her, love her, say they miss her, and constantly ask to come home. She also stated that she loves the children, always met their physical needs when they were in her care, and that she knew she could access programs like WIC (Special Supplemental Nutrition Program for Women, Infants and Children) and Medicaid, which she used previously for assistance.

However, Whitely pointed to the Department's concern about Mother's relapses, demonstrated by her positive drug-test results following her negative drug-test results. Whitely testified that Mother lacked the stability necessary to provide for the children, noting that Mother "has lived with her grandfather off and on throughout the entirety of this case," and that Mother "reported twice to us that the grandfather had kicked her out." Whitely also testified that Mother instigated the incident involving the harassment of her ex-boyfriend.

Additionally, Whitely recalled a domestic-violence report in a prior case, in which M.O. was at the hospital with a suspected broken rib and "[Mother] reported to the nurses that "[N.O.] had hurt [M.O.]'s ribs," "[N.O.] was hurting her," and "[N.O.] had gotten rough with the baby."[10] Mother testified that she had taken the infant M.O. to the hospital because he was not eating. She recalled that "they saw nothing at the time" on M.O.'s x-rays, but "he had bruising on him, and they asked me what that could be from." Mother denied knowing the cause of

---

[10] According to the affidavit in support of court-ordered services, the disposition for the prior case from June 2022 was "Reason to Believe," "[M.O.] received physical injuries that were believed to be a substantial risk of physical abuse," and "[m]edical professionals believe that there is little to no chance that the injuries are accidental."

M.O.'s bruising and testified that "[N.O.] was the one who, I guess, had told them he might have aggressively grabbed the baby. And I—again, I did not know at the time." She denied that there were any police reports or police involvement at that time.

The Department sought termination of Mother's parental rights to all three children and to name B.W. as M.J.F.'s sole managing conservator. Whitely testified that this is in M.J.F.'s best interest because B.W. had shown his ability to be stable and provide for M.J.F. along with his other siblings. Moreover, M.J.F. seems happy and told Whitely that he wants to live with B.W. Whitely had similarly testified that M.J.O. and M.O. are doing well in their foster-to-adopt home. She added that these two children "deserve a chance at stability and a loving home, and a chance to thrive with a parent that's not struggling with her addictions and unable to provide those things for [them]." She opined that termination is in M.J.O.'s and M.O.'s best interest "because these kids have had this since they were born. They've been dealing with the instability, the drug use, the physical violence. And I think they all deserve a shot at not having that in their life anymore." A CASA (Court Appointed Special Advocates) volunteer concurred, testifying that termination of Mother's parental rights is in the best interest of the children because of her inability to provide a safe, stable, drug-free, and violence-free environment. Similarly, the attorney ad litem for the children reported to the trial court that the children deserve a chance for stability and noted that M.J.O. and M.O. are safe and "they are bonding" in their foster-to-adopt home. Given Mother's history over the 20 months of the case, the ad litem questioned what would change if Mother's rights were not terminated.

At the conclusion of the bench trial, the court terminated Mother's parental rights to the children on four statutory grounds, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), (F), (O), and found that termination of her rights is in the children's best interest, *see id*. § 161.001(b)(2).

**DISCUSSION**

"To terminate parental rights, the factfinder must find by clear and convincing evidence that (1) at least one of the termination grounds set forth in Section 161.001(b)(1) or other sections of the Texas Family Code applies, and (2) termination is in the best interest of the child." *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024). "Clear and convincing evidence 'will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id*. (quoting Tex. Fam. Code § 101.007). This "higher standard of proof" is required "[b]ecause the termination of parental rights implicates fundamental interests." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014).

An appellate court conducting a legal sufficiency review in termination cases considers all evidence in the light most favorable to the trial court's finding, as well as any undisputed contrary evidence, to determine whether a reasonable factfinder could have formed a firm belief or conviction that it was true. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). "Courts 'must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so,' but courts 'should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.'" *In re C.E.*, 687 S.W.3d at 308 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

In a factual sufficiency review of a termination finding, the appellate court considers and weighs disputed evidence contrary to the trial court's findings against the evidence in favor of the finding. *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. However, appellate courts "provide due deference to

14

the decisions of the factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d at 503. We cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108-09 (Tex. 2006); *see In re C.E.*, 687 S.W.3d at 314 (stating that factfinders are "entitled to choose to believe one witness and disbelieve another with respect to the disputed facts of this case").

**Sufficient evidence supporting termination for endangerment under § 161.001(b)(1)(E)**

Mother's appeals challenge the sufficiency of the evidence supporting termination of her parental rights under four statutory-predicate grounds, which address the endangerment of the children, failure to support the children, and failure to comply with the provisions of a court order specifically establishing the actions necessary for return of the children. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (F), (O). We review her challenge to the trial court's endangerment finding under subsection 161.001(b)(1)(E) first, because of its significant collateral consequences. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) (explaining that appellate court must review sufficiency of evidence supporting subsection 161.001(b)(1)(D) or (E) grounds when parent has presented issue because endangerment findings may be used as basis for terminating parental rights in subsequent proceedings involving other children).[11]

---

[11] Because those collateral consequences are identical whether termination of parental rights is supported under subsection (D), or (E), or both, we need only review the sufficiency of evidence supporting one of those grounds. *J.B.M.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00661-CV, 2023 WL 2920315, at *8 (Tex. App.—Austin Apr. 13, 2023, pet. denied) (mem. op.). *But see id.* at *12-*14 (Theofanis, J., concurring) (opining that courts should review evidentiary-sufficiency findings under both subsections (D) and (E) when challenged).

The Family Code authorizes termination of parental rights if the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "'Endanger' means 'to expose to loss or injury; to jeopardize.'" *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861 at *4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). A parent's endangering conduct need not be directed at the child, nor must the child actually suffer injury. *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024). "Instead, endangerment encompasses a larger array of conduct that exposes a child to loss or injury or jeopardizes the child." *Id*. (cleaned up). A factfinder may infer endangerment from a course of conduct that presents substantial risks to the child's physical or emotional well-being. *Id*. These risks "can be developed by circumstances arising from and surrounding a parent's behavior"; however, they "must be more than 'a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" *Id*. (quoting *Boyd*, 727 S.W.2d at 533). The conduct does not have to occur in the presence of the child, and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Pruitt*, 2010 WL 5463861 at *4; *see In re C.E.*, 687 S.W.3d at 310 (stating that (D) and (E) grounds "do not require that endangering 'conduct be directed at the child' or that the child 'actually suffer[ ] injury'" (quoting *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022))). "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Pruitt*, 2010 WL 5463861, at *4.

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet denied); *see In re C.E.*, 687 S.W.3d at 310 (stating that subsection (E) "requires that a parent's conduct endanger the child's physical or emotional well-being" but that "[p]roof that a parent specifically caused an injury is not necessary"). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.E.-M.N.*, 342 S.W.3d at 262. The relevant time period for Texas Family Code § 161.001(b)(1)(E) includes parental conduct occurring "both before and after the child has been removed by the Department." *D.N.-B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00092-CV, 2020 WL 4462327, at *2 (Tex. App.—Austin July 24, 2020, pet. denied) (mem. op.).

Although a finding of endangerment based on drug use alone is not automatic, a parent's positive tests during the pendency of a termination case supports a finding that the parent's illegal drug use is an ongoing habit that created an endangering environment for the child. *D.H. v. Texas Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 61 (Tex. App.—Austin 2021, no pet.). This is because a parent's ongoing drug use jeopardizes the parent-child relationship and subjects the child to a life of uncertainty and instability. *Id.* at 62. Pervasive drug use can cause a reasonable inference that the drug use is endangering even in the absence of evidence that drug use caused an endangering activity or that it occurred while the children were in the parent's direct care. *Id.* at 61. Similarly, evidence of domestic violence may support a finding of endangerment under subsection (E), even if the violence is not directed toward the child. *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *In re*

17

*R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment.").

Here, Mother's arguments as to the endangerment ground in subsection (E) are that (1) she was likely the victim in the February 2024 domestic-violence incident that occurred while the children were present, and (2) although she initially tested positive on a drug test after that domestic-violence incident, "the collection of the specimen was not conducted in the usual way[,]" and she "paid for a private test that exonerated the February 2024 test from the Department." Mother contends, "[o]ther than these incidents described above, the Department did not detail any actions, omissions, or failures to act which would endanger the children."

Notably, Mother does not dispute the evidence of domestic violence committed in front of the children, during which she and N.O. physically fought, and at least one of the children was shoved down. *See In re D.C.*, No. 06-18-00114-CV, 2019 WL 2455622, at *8 (Tex. App.—Texarkana June 13, 2019, no pet.) (mem. op.) (considering, among other evidence under subsection (E), that parents "engaged in emotional and physical abuse in front of the children"). Further, Mother's argument overlooks the evidence of endangerment based on her May 23, 2024 and October 3, 2024 drug tests during this case showing that she continued to test positive for cocaine. *See In re D.H.*, 652 S.W.3d at 61; *In re R.M.*, No. 12-21-00099-CV, 2021 WL 4898460, at *4 (Tex. App.—Tyler Oct. 20, 2021, pet. denied) (mem. op.) ("[E]vidence that the parent continued to use illegal drugs even though the parent knew her parental rights were in jeopardy is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being."). The negative drug test that Mother says "exonerated" her was performed on a sample of her hair a few days after she dyed it.

18

Contrary to Mother's contention that the Department did not detail actions, omissions, or failures to act that would endanger the children besides the domestic-violence incident and her positive drug test for cocaine and cocaine metabolite in February 2024, the evidence at trial established that

- Mother's drug paraphernalia, and suspected drugs belonging to her and N.O., were left in a diaper bag that would have been accessible to the child who was not in a car seat;

- Mother's children were removed from her care in February 2023 after she tested positive for cocaine, cocaine metabolite, marijuana, and marijuana metabolite; her child M.J.O. tested positive for cocaine, cocaine metabolite, marijuana, and marijuana metabolite; and her child M.J.F. tested positive for cocaine, cocaine metabolite, and methamphetamine;

- Mother's Rule 11 agreement stipulated that the evidence supports a finding of aggravated circumstances because she engaged in conduct against the children that constitutes the offense of child endangerment, a felony under Texas Penal Code § 22.041;

- Mother reported "using marijuana since age 14";

- Mother's harassment of her ex-boyfriend resulted in a police report filed against her;

- Mother's March 28, 2024 negative drug test resulted from a hair sample collected a few days after she dyed her hair;

- After the children's removal from her care for the second time, Mother tested positive on May 23, 2024, for cocaine; and

- Mother's negative drug test on July 22, 2024, was followed by her positive drug test on October 3, 2024, for cocaine.

Mother asserted that she has "always been there for" her children and has provided for their physical needs when they were in her care. But she had no explanation for her children's positive drug tests for cocaine, marijuana, and methamphetamine; she did not dispute that the drug paraphernalia in a diaper bag was hers; she acknowledged that the suspected drugs in the diaper bag were hers (and N.O.'s); and she admitted engaging in "domestic violence in front of the children" (which occurred around the same time that she again tested positive for

19

cocaine). Moreover, as the factfinder, the trial court was the sole judge of the credibility of Mother's testimony that her positive drug-test results were not the result of her own drug use but were the fault of urgent-care staff, her "ex," or someone who exposed her to drugs after she got drunk at a party. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (requiring due deference to decisions of factfinder, "the sole arbiter when assessing the credibility and demeanor of witnesses"); *In re B.F.*, No. 14-17-00421-CV, 2017 WL 5505821, at *7 (Tex. App.—Houston [14th Dist.] Nov. 16, 2017, no pet.) (mem. op.) (concluding that "trial court was free to reject [m]other's self-serving testimony in favor of scientific evidence").

After viewing all the evidence in the light most favorable to the trial court's statutory-predicate finding and considering any evidence contrary to its finding, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother engaged in a course of conduct that endangered her children's physical or emotional well-being. *See In re A.C.*, 560 S.W.3d at 631. And given the entire record, we conclude that the disputed evidence is not so significant that the trial court, as the factfinder, could not have formed a firm belief or conviction that Mother engaged in a course of conduct endangering to her children. *See id.* Thus, the evidence is legally and factually sufficient to support the trial court's termination of Mother's parental rights under subsection (E), *see* Tex. Fam. Code § 161.001(b)(1)(E), and we overrule her appellate issues contending otherwise. Having determined that the evidence is legally and factually sufficient to support termination of Mother's parental rights under subsection (E), we need not consider the sufficiency of the evidence to support termination under subsections (D), (F), and (O). *See* Tex. R. App. P. 47.1; *In re N.G.*, 577 S.W.3d at 232, 234; *J.B.M.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00661-CV, 2023 WL 2920315, at *8 (Tex. App.—Austin Apr. 13, 2023, pet. denied) (mem. op.).

20

**Sufficient evidence supported finding that termination is in children's best interest**

Mother also challenges the sufficiency of the evidence supporting the trial court's finding that termination of her parental rights is in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(2). We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the children's wishes, if appropriate given the children's ages; the children's emotional and physical needs now and in the future; emotional or physical danger to the children now and in the future; the parenting abilities of the parties seeking custody; programs available to help those parties; plans for the children by the parties seeking custody; the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976); *see In re A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *see also* Tex. Fam. Code § 263.307 (recognizing that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors court should consider in determining whether child's parents are willing and able to provide child with safe environment). These factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d at 27. We consider the totality of the circumstances in light of these factors when determining whether sufficient evidence supports the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied). Evidence

probative under the statutory-predicate grounds may be probative of best interest as well. *In re A.C.*, 560 S.W.3d at 631-32.

Concerning the evidence of the children's wishes, the trial court heard testimony that five-year-old M.J.F. is very happy, stated that "he wants to live with Dad [B.W.]," and had bonded with B.W.'s fiancée. Other evidence indicated that M.J.O. and M.O. are doing "phenomenal[ly]" well in their foster-to-adopt home. Because Mother's children were ages five, four, and two when trial began, they did not testify about their own wishes. The children's young age rendered consideration of the first *Holley* factor neutral. *See In re A.H.*, No. 02-23-00348-CV, 2024 WL 191229, at *5 (Tex. App.—Fort Worth Jan. 18, 2024, pet. denied) (mem. op.) (noting that children who were ages five and four did not testify at trial and that first *Holley* factor is considered neutral when children are too young to express their desires); *In re D.A.B.*, No. 04-19-00629-CV, 2020 WL 1036433, at *7 (Tex. App.—San Antonio Mar. 4, 2020, no pet.) (mem. op.) (noting that three-year-old child was too young to express desires); *In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (concluding that young age of children rendered consideration of children's wishes neutral).

As for the children's emotional and physical needs now and in the future, the possible emotional and physical danger to them now and in the future, and the parent's acts or omissions indicating that the parent-child relationship is improper, Mother testified that she loves the children, she always met their physical needs when they were in her care, and the children need her, love her, say they miss her, and constantly ask to come home. However, the evidence established that the children were removed from Mother's care initially in 2023 because she and her children had positive drug-test results, and they were removed from her a second time in 2024—while this case was pending—after drug tests showed she had relapsed on cocaine.

22

Mother could not explain why her children tested positive for cocaine, marijuana, and methamphetamine. She disputed that she had not "gotten clean" for her children and claimed that her positive drug-test results were someone else's fault. Further, the trial court heard evidence that Mother, who was 24 years old when trial began, reported a history of "using marijuana since age 14." The evidence on these factors supports the trial court's best-interest finding. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (noting that parental drug use is relevant to best-interest determination); *see also In re F.A.R.*, No. 11-04-00014-CV, 2005 WL 181719, at *4 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.) (noting that evidence of mother's continued drug use, even after completing drug treatment, demonstrated her inability to provide stable environment for child and her inability to provide for his emotional and physical needs).

Regarding Mother's parental abilities and as to the programs available to assist her in promoting the children's best interests, Mother testified that she has a loving and supporting home, a good job, the ability to afford the children. Mother stated that she has a car to get them to school and daycare and has plans to renew her driver's license. She knew that she could access programs like WIC and Medicaid, which she used previously for assistance. Mother initially complied with her service plan by completing parenting-education classes, her OSAR evaluation, and an outpatient substance-abuse-treatment program, and after about nine months of sobriety, the children were returned to her in November 2023. Despite completing those services, and Mother's testimony that she has "been clean," Mother continued to test positive for cocaine; she instigated the "constant" harassment of her ex-boyfriend that resulted in a police report against her; and she was involved in a domestic-violence incident in front of the children during which at least one of them was shoved down onto a concrete walkway. From

23

this evidence, the trial court could have reasonably found that Mother lacked the parenting skills to avoid exposing her children to the dangers of drug use, poor choices, and domestic violence, and that termination of her parental rights was in their best interest. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (noting that factfinder may measure parent's future conduct by parent's past conduct in best-interest determination).[12]

As to the plans for the children and stability of the proposed placement, Mother testified that if the children were returned to her, they would live with her at her grandfather's home, where they have their own rooms, their own beds, and where they had been "on and off for the past two years." She further testified that her current job as a salon hairstylist offered flexible scheduling, plus alternating Saturdays and every Sunday off. Her childcare plans involved assistance from a couple of friends, who offered to help her on their days off, and from the children's grandmother, who would watch them every other weekend. However, the trial court heard evidence raising concern about stable housing for the children because Mother "has lived with her grandfather off and on throughout the entirety of this case," she "reported twice to [the Department] that the grandfather had kicked her out," and the 2024 domestic violence occurred after the grandfather told Mother that her that the children could stay there only at night to sleep. Mother described her grandfather as "very old" and "overwhelmed."

The evidence also showed that M.J.O. and M.O. were placed in a foster-to-adopt home where they were both doing "phenomenal[ly]." Behavioral issues that M.J.O. exhibited at

---

[12] We disagree with Mother's contention that the evidence on these factors is analogous to that in *In re E.J.C.*, No. 04-23-00519-CV, 2023 WL 7367772, at *6 (Tex. App.—San Antonio Nov. 8, 2023, no pet.) (mem. op.). There, the San Antonio Court of Appeals noted that the trial court's ruling erroneously relied on "its recollection of prior hearings and information" not offered into evidence at trial. *Id.* at *3. And the only testimony from the Department at trial was that the individual's parental rights should be terminated because there was "no proof of income, and the housing is inappropriate." *Id.* at *6 n.4.

daycare while placed at his paternal grandmother's home had resolved since his attendance at another daycare and placement at the second foster home. There was also evidence that M.J.F. is happy being with B.W. and his other relatives and that M.J.F. showed improvement since his placement with B.W. by becoming more polite and making "phenomenal" progress academically. M.J.F. did not seem "as thrilled" about his visits with Mother, did not engage with her as much as he used to during her visits, and seemed less talkative and more irritable after her visits. B.W. testified that he does not believe Mother is capable of sobriety and healthy parenting in the future, and that termination of her parental rights is in M.J.F.'s best interest. Evidence on these factors also supports the trial court's best-interest finding. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at \*17 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (considering in best-interest determination evidence that children were doing well in placement with foster parents, who met children's needs); *In re J.I.M.*, 517 S.W.3d 277, 286-87 (Tex. App.—San Antonio 2017, pet. denied) (mem. op.) (considering in best-interest determination that child improved after removal from parent's home and placement with another relative); s*ee also In re A.K.*, Nos. 07-17-00353-00354-CV, 2018 WL 912703, at \*6 (Tex. App.—Amarillo Feb. 15, 2018, pet. denied) (mem. op.) (noting that "trial court may consider evidence that the children made improvements since removal when looking at the emotional and physical needs of the children now and in the future").

Lastly, as to any excuses for the parent's conduct, Mother's testimony shifted responsibility for her positive drug-test results to the urgent-care staff who took her hair sample, her "ex," or someone who exposed her to drugs after she got drunk at a party. As we have noted, the trial court, as the factfinder, was the sole judge of the credibility of these excuses and reasonably could have disbelieved them. *See In re A.B.*, 437 S.W.3d at 503; *G. S. v. Texas Dep't*

25

*of Fam. & Protective Servs.*, No. 03-20-00342-CV, 2020 WL 6479017, at \*6 (Tex. App.—Austin Nov. 4, 2020, pet. denied) (mem. op.) (noting that trial court could have disbelieved parent's excuses for his conduct during case). Also, the trial court could have credited evidence that was probative of the statutory-predicate ground of endangerment as probative of the children's best interest. *See In re A.C.*, 560 S.W.3d at 631-32 (noting that evidence probative under statutory-predicate grounds may be probative of best interest as well).

Only Grandmother and Mother disputed Whitely's recommendation, which the CASA volunteer joined, that termination of Mother's parental rights was in the children's best interest. The trial court could have rationally accepted the latter witnesses' recommendations. *See In re S.P.*, No. 02-18-00243-CV, 2018 WL 6565950, at \*17 (Tex. App.—Fort Worth Dec. 13, 2018, pet. denied) (mem. op.) (concluding that trial court could have rationally accepted recommendations of children's attorney ad litem, CASA workers, and Department's representatives over those of parent's former pastor and parent's family). We conclude that the evidence, viewed under the applicable standards of review discussed above, is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights is the children's best interest. We overrule Mother's issues challenging the best-interest finding.

## CONCLUSION

We affirm the trial court's final orders.

_____

Darlene Byrne, Chief Justice

26

Before Chief Justice Byrne, Justices Kelly and Ellis

Affirmed

Filed:   March 31, 2025